UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF NEW YORK

- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - x

BELNORD REALTY ASSOCIATES L.P.,
BPS PARTNERS L.P., A PARTNER OTHER
THAN THE TAX MATTERS PARTNER, AND
BELNORD REALTY CORP., TAX MATTERS
PARTNER,

                                        Plaintiffs,

                                                    13 CV 8999 (LGS)

                                                    COMPLAINT

      *v.*

UNITED STATES OF AMERICA,

                                        Defendant.

- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - x

## *Preliminary Statement*

1.      In order to encourage the preservation of significant historic structures, Congress has allowed the value of a perpetual easement on the facade of such a structure that is donated to a qualified charitable organization (such as the National Architectural Trust, Inc.) to be claimed as a charitable contribution tax deduction. The Internal Revenue Code (the "Code") allows this deduction because the granting of the easement imposes onerous restrictions on the operation of the building that adversely affect its fair market value, particularly in the context of commercial and other income-producing real property. The amount of the deduction to be allowed for the grant of an easement on the facade of a New York City property is at issue in this case. The Internal Revenue Service has taken the position that no deduction may be claimed, despite the statute's explicit allowance of a deduction, and despite the owner's having presented a qualified appraisal that shows a value for the easement in excess of $90,000,000.

2.      During 2006, in furtherance of Congress's conservation purpose, Belnord Realty Associates L.P. (the "Partnership") contributed an easement to preserve in perpetuity the facade of the Belnord, the Partnership's well-known, valuable, and historically significant building in New York City.

3.      The Belnord is a certified historic structure that was designed in 1908 by the noted architectural firm of Hiss and Weekes and added to the National Register of Historic

Places in 1980. The Belnord is located at 225 West 86 Street, on the Upper West Side of Manhattan.

4.  The Partnership scrupulously complied with the requirements of the Code and the Regulations thereunder for obtaining the Congressionally mandated tax benefits for its contribution, and, on its return for 2006 (Form 1065), the Partnership claimed a charitable contribution deduction of $90,425,553, an amount equal to the value of the charitable contribution as adjusted pursuant to Code § 170(f)(14).

5.  The restrictions imposed by the easement contributed by the Partnership require, *inter alia*, the Partnership to seek permission from the donee at any time that the Partnership wishes to make changes to the facade of the Belnord, including in connection with the periodic turnover of retail tenants on the ground floor of the building or in connection with making internal improvements that may require even minor adjustments to the facade. These restrictions impose significant limitations on the Partnership's flexibility (and on the flexibility of any potential purchaser of the Belnord) in dealing with its real property and result in a significant decrease in the Belnord's fair market value.

6.  Nevertheless, contrary to the Code, the Internal Revenue Service has not only denied any deduction for the value of the contribution, but it has also sought to impose a substantial penalty by the reason of the Partnership's having claimed the deduction.

7.  This case involves Plaintiffs' challenge to the Internal Revenue Service's proposed total disallowance of the deduction claimed by the Partnership for contribution made by the Partnership during 2006 to a qualified charity.

## *Jurisdiction, Venue, and Demand for Jury Trial*

8.  This action for judicial review of a final partnership administrative adjustment ("FPAA") arises under federal statutes, 26 U.S.C. § 6226(b)(1) and 28 U.S.C. § 1346(e), as hereinafter more fully appears.

9.  This Complaint constitutes a petition for a readjustment of the partnership items of the Partnership for its tax year ended December 31, 2006.

10. The Partnership's principal place of business is located in New York, NY.

11. On or about October 10, 2007, the Partnership filed its U.S. Return of Partnership Income (Form 1065) for 2006 by mailing such return to the Internal Revenue Service Center, Ogden, UT  84201-0011.

12. On July 25, 2013, the Internal Revenue Service mailed a Notice of Final Partnership Administrative Adjustment for 2006 (the "FPAA") to the tax matters partner ("TMP") of the Partnership. A copy of the FPAA is attached as Exhibit A.

13.    Plaintiff BPS Partners L.P. ("BPS") is a limited partnership with its principal place of business at 805 3rd Avenue, 7th Floor, New York, NY 10022.

14.    BPS is classified as a partnership for Federal income tax purposes.

15.    At all times during 2006, BPS was a limited partner of the Partnership.

16.    BPS is a "notice partner" in the Partnership within the meaning of Code §§ 6226(b)(1) and 6231(a)(8).

17.    BPS is not the TMP of the Partnership.

18.    Plaintiff Belnord Realty Corp. is a corporation with its principal place of business at 805 3rd Avenue, 7th Floor, New York, NY 10022.

19.    Belnord Realty Corp. is classified as an S corporation for Federal income tax purposes.

20.    At all times during 2006, Belnord Realty Corp. was the general partner of the Partnership.

21.    Belnord Realty Corp. is a "notice partner" in the Partnership within the meaning of Code §§ 6226(b)(1) and 6231(a)(8).

22.    Belnord Realty Corp. is the TMP of the Partnership.

23.    The TMP of the Partnership did not file a Petition or Complaint for readjustment of the partnership items of the Partnership for 2006 with any court within the period specified in Code § 6226(a).

24.    In accordance with Code § 6226(e)(1), on or about December 16, 2013, an amount representing what would be the increase in the tax liability of the individual who is the sole indirect partner owning interests in the Partnership through Plaintiffs (directly and through one or more other pass-through partners), if the treatment of the partnership items of the Partnership on Plaintiff's returns and on such individual's return were made consistent with the treatment of such partnership items on the Partnership's return, as adjusted by the FPAA, was deposited with the Internal Revenue Service. This deposit was made by the mailing of a check for $2,012,619 to Internal Revenue Service, Small Business Self-Employed, Cotter Federal Building, Technical Services:TEFRA:East:Stop 190, 135 High Street, Hartford, CT 06103-1185.

25.    Each of BPS and Belnord Realty Corp. has an interest in the outcome of this proceeding within the meaning of Code § 6226(d).

26.    Defendant is the United States of America.

27. Venue is proper in this district pursuant to Code §§ 6226(b)(1) and 6226(a)(2), because Defendant is the United States of America and because the Partnership's principal place of business is within the Southern District of New York.

28. Jury trial is demanded on all issues triable of right by a jury.

*Assertions of the Commissioner of Internal Revenue in the FPAA*

29. The FPAA proposes to disallow a charitable contribution deduction in the amount of $90,425,553 claimed on the Partnership's return for 2006 (Form 1065).

30. The FPAA also apparently proposes to adjust the amount of distributions of money made by Partnership during 2006.

31. The FPAA is unclear as to whether the proposed adjustment to the amount of distributions of money is a mere typographical error and, if not, whether the proposed adjustment is an increase or a decrease, and the FPAA is silent as to the asserted grounds for that proposed adjustment.

32. The FPAA also proposes to impose accuracy-related penalties on the partners in the Partnership.

*Grounds for Readjustment*

33. Since 1994, the Partnership has owned a residential rental apartment building known as the "Belnord" located in Manhattan  and occupying a full city block bounded by West 86 Street, Amsterdam Avenue, West 87 Street, and Broadway.  The street address of the Belnord is 225 West 86 Street, New York, NY 10024.

34. The Belnord is a 12-story luxury rental apartment building containing 215 residential units, a superintendent's apartment, and four ground level retail stores

35. The Belnord was listed on the National Register of Historic Places on April 23, 1980.

36. The Partnership, by deed dated December 4, 2006, granted a perpetual easement on the facade of the Belnord to the National Architectural Trust, Inc. (the "Trust," now known as The Trust for Architectural Easements), exclusively for conservation and historic preservation purposes (the "Contribution").

37. The Contribution was made by means of a Historic Preservation Deed of Easement (the "Deed") dated December 4, 2006, a copy of which is attached hereto as Exhibit B.

38. The Contribution was made by the Partnership of a restriction (granted in perpetuity) on the use which may be made of the Partnership's real property, which constitutes a "qualified real property interest" for purposes of Code § 170(h)(1)(A).

39.    The Deed includes a restriction which preserves the entire exterior of the building with respect to which the Contribution was made and prohibits any change in the exterior of the building that is inconsistent with the historical character of such exterior.

40.    The restrictions imposed by the easement contributed by the Partnership require, *inter alia*, the Partnership to seek advance permission from the donee at any time that the Partnership wishes to make changes to the facade of the Belnord, including in connection with the periodic turnover of retail tenants on the ground floor of the building or in connection with making internal improvements that may require even minor adjustments to the facade.

41.    These restrictions and the other terms of the Deed (which are incorporated herein by this reference) impose significant limitations on the Partnership's flexibility (and on the flexibility of any potential purchaser of the Belnord) in dealing with its real property and result in a significant decrease in its fair market value.

42.    The Code contains provisions (particularly §§ 170(f)(3)(B)(iii) and 170(h)) that enable taxpayers to claim charitable contribution deductions for "qualified conservation contributions." These provisions advance the Congressional purpose of encouraging the preservation of certified historic structures by the making of such contributions.

43.    The Partnership's grant of an easement to the Trust was a "qualified conservation contribution" that fully qualified for the benefits of such provisions.

44.    In order to report properly and not to overvalue the charitable contribution deduction to which it was entitled as a result of the grant of the easement, the Partnership obtained an appraisal of the easement. The appraisal determined the value of the Belnord before the grant of the easement to be $721,000,000.

45.    On its 2006 return of partnership income (Form 1065) for 2006, the Partnership claimed a charitable contribution deduction for the perpetual easement on the façade of the Belnord it had granted to the Trust, and the amount claimed as a deduction was based on the value of such easement determined by the qualified appraisal it obtained (adjusted as required by Code § 170(f)(14)).

46.    At all relevant times, the Trust was a charitable organization recognized by the Internal Revenue Service as a tax exempt organization under Code § 501(c)(3).

47.    The Trust is a "qualified organization," as defined in Code § 170(h)(3).

48.    The Contribution was made exclusively for the preservation of a certified historic structure, which constitutes "conservation purposes" for purposes of Code § 170(h)(1)(C).

49.    The Partnership and the Trust entered into a written agreement certifying, under penalty of perjury, that the Trust is a "qualified organization" (as defined in Code § 170(h)(3))

with a purpose of historic preservation and has the resources to manage and enforce the granted restriction and a commitment to do so.

50.    The value of the Contribution on the date that it was made was not less than $92,000,000, the amount reported as such by the Partnership on its timely filed partnership return for 2006 (Form 1065).

51.    The Deed was delivered to the Trust on or about December 4, 2006.

52.    The Deed was recorded or filed in the Office of the City Register of the City of New York on December 18, 2006.

53.    The Partnership included with its return for 2006 (Form 1065) a description of the contributed property.

54.    The Partnership included with its return for 2006 (Form 1065) such other information as was required by Code § 170(f)(11)(B), (C), and (D), Treasury Regulation § 1.170A-13, and Internal Revenue Service Form 8283.

55.    The Partnership included with its return for 2006 (Form 1065) a copy of an appraisal obtained by the Partnership (the "Appraisal"), information on the contributed property, a declaration of the appraiser, and a donee acknowledgement.

56.    The Appraisal was a "qualified appraisal" made by a "qualified appraiser," as such terms are used in Code § 170(f)(11)(E)(i) and (ii) and Treasury Regulation § 1.170A-13.

57.    The Appraisal valued the Contribution at $92,000,000 as of December 14, 2006.

58.    Prior to the filing of its return for 2006 (Form 1065), the Partnership made a further good faith investigation of the value of the contributed property.

59.    The Partnership made distributions of money to its partners during 2006 in the amount reflected on its return (Form 1065) for that year.

60.    The principal adjustment made in the FPAA is a determination that the Partnership is not entitled to a charitable contribution deduction under Code § 170 with respect to the Contribution.

61.    Notwithstanding the Partnership's full compliance with the relevant provisions of the Internal Revenue Code, the Internal Revenue Service has proposed to disallow the Partnership's claimed charitable contribution deduction and thereby to deprive the Partnership and its partners of tax benefits provided under Code § 170(h) that Congress intended for them to have.

### *Inapplicability of Penalties*

62.   To the extent this Court determines that any underpayment of tax does exist by any direct or indirect partner in the Partnership, such underpayment was not attributable to negligence or disregard of any rules or regulations, a substantial understatement of income tax, or a substantial valuation misstatement (including, without limitation, a gross valuation misstatement), as such terms are used in Code § 6662.

63.   In the alternative, the value that would be needed to support the charitable contribution deductions actually claimed (for all taxable years in the aggregate) by one or more indirect partners holding an interest in the Partnership was not more than 150% of the value of the Contribution (even if the amount of charitable contribution deductions shown on the Partnership's return was a greater amount). A penalty for a substantial valuation misstatement can accordingly not be imposed on such indirect partners, because no substantial valuation understatement penalty is due from any partner unless the aggregate amount of the charitable contribution deductions claimed by that partner exceeds by more than 50% that partner's aliquot share of the value of the Contribution determined by the Court.

64.   In the alternative, the value that would be needed to support the charitable contribution deductions actually claimed (for all taxable years in the aggregate) by one or more indirect partners holding an interest in the Partnership was not more than 200% of the value of the Contribution (even if the amount of charitable contribution deductions shown on the Partnership's return was a greater amount). A penalty for a gross valuation misstatement can accordingly not be imposed on such indirect partners, because no gross valuation understatement penalty is due from any partner unless the aggregate amount of the charitable contribution deductions claimed by that partner exceeds by more than 100% that partner's aliquot share of the value of the Contribution determined by the Court.

65.   In the alternative, to the extent this Court determines that any underpayment of tax was attributable to negligence or disregard of rules or regulations, a substantial understatement of income tax, or a substantial valuation misstatement, there was a reasonable cause for such underpayment, the Partnership (and each partner therein) acted in good faith with respect to such underpayment within the meaning of Code § 6664, and all other requirements of Code § 6664(c) were satisfied.

66.   In the alternative, to the extent this Court determines that any underpayment of tax is attributable to a substantial understatement of income tax (and either there is not a reasonable cause for such underpayment or the Partnership (and the partners therein) did not act in good faith with respect to such underpayment), the amount of the understatement should be reduced to zero by reason of Code § 6662(d)(2)(B).

### *Conclusion and Prayer for Relief*

67.   All adjustments proposed in the FPAA are erroneous.

WHEREFORE, Plaintiffs demand judgment in their favor and against the United States:

(1) that there is no adjustment to any item of income, gain, loss, deduction, or credit of the Partnership for the year ended December 31, 2006, and no adjustment to the amount of distributions made by the Partnership, and that the Court in all other respects determine with respect to those issues that are properly before this Court in this proceeding that the proposed adjustments (including penalties) in the FPAA are erroneous and/or arbitrary and capricious in fact and in law and that none of the adjustments asserted by Respondent in the FPAA should be made (but, if such adjustments are to be made to any extent, that appropriate upward adjustments to basis should be made); and

(2) for Plaintiffs' costs and attorney's fees (to the extent allowable by law); and

(3) for such other and further relief as this Court deems appropriate.


Dated:  New York, New York
        December 19, 2013

Of Counsel:

Roberts & Holland, LLP
825 Eighth Avenue, 37th Floor
New York, NY  10019
(212) 903-8700

Respectfully submitted,

Richard A. Levine (RL 4451)
Attorney for Plaintiffs
825 Eighth Avenue, 37th Floor
New York, NY  10019
(212) 903-8729

Exhibit A

**Internal Revenue Service**
**Small Business Self-employed**
Cotter Federal Building
Technical Services:TEFRA:East: Stop 190
135 High Street
Hartford, CT 06103-1185

Belnord Realty Corp.
Tax Matters Partner
Belnord Realty Associates, L. P.
c/o Extell Development Company
805 3rd Avenue, 7th Floor
New York, New York 10022

# CERTIFIED MAIL
## No 7009 0820 0000 8497 1841

**Department of the Treasury**

Date: JUL 2 5 2013

Taxpayer Identifying Number:

Name of Partnership:
Belnord Realty Associates, L. P.
Partnership Identifying Number:
▮▮▮▮▮▮▮▮

Tax Year Ended:
December 31, 2006
Contact Hours:
7:00 a. m. – 3:30 p. m. Eastern
Person to Contact:
Katherine Papathanasis, LTC
Employee ID Number:
1000669522
Contact Telephone Number:
(860) 756-4627
Date FPAA Mailed to Tax Matters Partner: JUL 2 5 2013

## NOTICE OF FINAL PARTNERSHIP ADMINISTRATIVE ADJUSTMENT

The law requires us to send a Notice of Final Partnership Administrative Adjustment (FPAA) to the partnership named above, for the tax year shown above, and to each partner who is entitled to receive this notice.

We are proposing adjustments to the partnership items of the partnership and tax year shown above. We will send the examination report outlining these adjustments to the Tax Matters Partner (TMP) of the partnership. (The TMP is the partner designated by the partnership to deal with the IRS.) He/she is also authorized to act for the partners who are not entitled to receive this notice. Any partner who wants a copy of the examination report should request it from the TMP. If the TMP is unable to provide you with a copy of the examination report, please contact the person named in the heading of this letter.

Taxable Years Ending Before August 6, 1997:

The adjustments to the partnership items reported on the partnership tax return may cause an increase or decrease to the tax liability on your individual return. Form 870-P, *Agreement to Assessment and Collection of Deficiency in Tax for Partnership Adjustments*, is a summary of the proposed adjustments to the partnership return. You can compute your share of the proposed adjustments by multiplying each adjusted partnership item by your percentage interest for that partnership item.

Taxable Years Ending After August 5, 1997:



The adjustments to the partnership items reported on the partnership tax return may cause an increase or decrease in the tax liability on your individual return. The adjustments may include partnership level determinations regarding penalties and additions to tax that relate to adjustments to partnership items. Form 870-PT, *Agreement for Partnership Items and Partnership Level Determinations as to Penalties, Additions to Tax, and Additional Amounts*, is a summary of the proposed adjustments to the partnership return. IRC section 6651 late filing penalty applies to any late filed returns that are required to report the partnership item adjustments. You can compute your share of the proposed adjustments by multiplying each adjusted partnership item by your percentage interest for that partnership item.

Letter 1830 (Rev. 7-2007)
Catalog Number 61242U

You have three options available to you:

**1. If you agree with the adjustments:**

Sign and return the enclosed Form 870-P/Form 870-PT. When you sign Form 870-P/Form 870-PT, you are agreeing to pay any additional tax and interest resulting from the adjustments to the partnership return. For tax years ending after August 5, 1997, you are also agreeing to any partnership level determination as to penalties, additions to tax, and additional amounts that relate to adjustments to partnership items, if any. In addition, you are waiving your rights to participate in any administrative or judicial proceeding affecting partnership items and in partnership level determinations as to penalties, additions to tax, and additional amounts that relate to adjustments to partnership items for the tax year in question. This is a binding settlement only if you sign and return Form 870-P/Form 870-PT and we sign on behalf of the Commissioner of Internal Revenue Service. When we sign the agreement form, the one-year extension of the period of limitations on assessments will begin under Internal Revenue Code section 6229(f). Once the agreement is signed by both parties, you may not file a claim to change the items in question or claim a refund/credit based on a readjustment.

Note: If you are the TMP of the partnership, see the section of this letter entitled, *"For the Tax Matters Partner of the Partnership."*

**2. If you do not agree with the adjustments:**

If you are the TMP of the partnership and want to contest the adjustments in court, you must file a petition within 90 days from the date of this letter. During this 90-day period, no other partner may file a petition for judicial review. You can file your petition for readjustment of partnership items with:

     1. the United States Tax Court;
     2. the United States Court of Federal Claims; or
     3. the District Court of the United States, in the district of the partnership's principal place of business.

A petition filed by the TMP precludes all other actions. If the TMP doesn't file a petition by the 90th day from the date the FPAA was mailed, any partner or any 5 percent group entitled to receive this notice may petition one of these courts. A "5 percent group" includes any group of partners who together have an interest of five percent or more in profits of the partnership. The petition must be filed after the 90th day, but on or before the 150th day from the date the FPAA was mailed to the TMP. If more than one petition is filed in Tax Court, the first petition filed will go forward. All other petitions (even those filed earlier in one of the other courts) will be dismissed. If no one files a petition in Tax Court, the first petition filed in one of the other courts will go forward and subsequent petitions will be dismissed. Petitions filed with the United States Tax Court must be mailed to:

**United States Tax Court**
**400 Second Street, NW**
**Washington, DC 20217**

Attach a copy of this letter to the petition. The time in which you must file a petition with the court is fixed by law and the court cannot consider your case if your petition is filed late. If this letter is addressed to both a husband and wife and both want to petition the Tax Court, both must sign the petition or each must file a separate signed petition.

When a partner (including each member of a 5 percent group that files a petition) files a petition in either the appropriate District Court or the Court of Federal Claims, the partner filing the petition must deposit the amount that the partner's tax liability would be increased if the treatment of the partnership items on the partner's return were made consistent with the treatment of partnership items under the FPAA. If you reported the partnership items the way the partnership reported them on its return, you can generally determine the amount to deposit by taking your pro rata share of the partnership adjustments into account in recomputing your tax. You must deposit the appropriate amount with the IRS on or before the day you file your petition.

**3. If you do nothing:**

If a petition for readjustment is not filed in any of the courts listed in this letter, the FPAA becomes final, and we will bill you for any additional tax plus interest that you may owe under the FPAA. You will not be permitted to contest the treatment of the partnership items of the partnership under the FPAA in any refund claim or suit. The law allows the Service to bill you after 150 days from the mailing date of the FPAA to the TMP.

However, if a petition is filed in the Tax Court, and the Tax Court upholds the adjustments in whole or in part, we will not bill you until the Tax Court decision is final.

You may wish to contact the TMP of the partnership or your tax advisor to discuss this matter.

If you have any questions, you can write to the person whose name and address are shown in the heading of this letter. If you write, attach a copy of this letter to help identify your account. Also, include your telephone number and the most convenient time for us to call you in case we need additional information.

If you prefer, you may call the IRS contact person at the telephone number shown in the heading of this letter.

Thank you for your cooperation.

Sincerely,

John W. Joseph
Territory Manager Technical Services: Western

Enclosures:
Form 870-P/Form 870-PT
Copy of this letter

**FOR THE TAX MATTERS PARTNER OF THE PARTNERSHIP**

If you are the Tax Matters Partner (TMP), you are entitled to make an agreement to bind non-notice partners to the treatment of the partnership items as shown on the enclosed schedule of adjustments. You must add the following statement above the signature blocks on the Form 870-P or Form 870-PT:

"The undersigned Tax Matters Partner is signing this offer on behalf of himself (herself) and all other partners whom he (she) has the authority to bind; a final agreement resulting from the co-signature of the Commissioner of Internal Revenue will be binding on all such other partners."

As the TMP, you may submit a petition, as described above for the partnership on behalf of all partners.

If you have any questions, you can call the IRS contact person at the telephone number shown in the heading of this letter. Thank you for your cooperation.

**Letter 1830 (Rev. 7-2007)**
Catalog Number 61242U

| Form 870-PT<br>(Rev. 4-2012)<br>For partnership<br>taxable years ending<br>after August 5, 1997 | Department of the Treasury — Internal Revenue Service<br>**Agreement for Partnership Items and Partnership Level Determinations as to Penalties, Additions to Tax, and Additional Amounts** | IN REPLY<br>REFER TO:<br><br>TS:TEFRA:E:KMP |
|---|---|---|
| Taxpayer(s) name(s), address and zip code:<br><br>Belnord Realty Corp.<br>Tax Matters Partner<br>Belnord Realty Associates, L. P.<br>c/o Extell Development Company<br>805 3rd Avenue, 7th Floor<br>New York, New York 10022<br><br>TIN: | Name of Partnership:<br><br>Belnord Realty Associates, L. P.<br><br><br>EIN: ▮▮▮▮▮▮<br>Name of Tax Matters Partner:<br><br>Belnord Realty Corp. | Tax Year(s) Ended:<br><br>12/31/2006 |

## Offer of Agreement to Partnership Items and Partnership Level Determinations as to Penalties, Additions to Tax, and Additional Amounts & Waiver of Restrictions on Assessment for Partnership Items, Penalties, Additions to Tax, and Additional Amounts

Under the provisions of sections 6224(c) and 7121 of the Internal Revenue Code (IRC), the Commissioner of the Internal Revenue Service and the undersigned taxpayer(s) agree to the determination of partnership items and partnership level determinations as to penalties, additions to tax, and additional amounts that relate to adjustments to partnership items as shown on the attached Schedule of Adjustments.

The undersigned taxpayer(s), in accordance with IRC sections 6224(b) and 6213(d), also waive(s) the restrictions provided by IRC sections 6225(a) and 6213(a) and consent(s) to the assessment and collection of any deficiency attributable to partnership items, penalties, additions to tax, and additional amounts that relate to partnership items, as set forth in the attached Schedule of Adjustments (plus any interest provided by law). IRC Section 6651 late filing penalty applies to any late filed (or non-filed) returns that are required to report the partnership item adjustments.

This agreement is conditional and will not become effective or final until this agreement form is returned to the Commissioner and is signed on his or her behalf. The one-year extension of the period of limitations on assessments under IRC section 6229(f) will not begin to run until the date the Commissioner's representative signs this form on the Commissioner's behalf. If this is a partial agreement, the period of limitations for assessing any tax attributable to the settled items shall be determined as if this agreement had not been entered into.

If this part of this agreement form is signed for the Commissioner, the treatment of partnership items and partnership level determinations as to penalties, additions to tax and additional amounts that relate to adjustments to partnership items under this agreement will not be reopened in the absence of fraud, malfeasance, or misrepresentation of fact. In addition, no claim for an adjustment of partnership items, refund or credit based on any change in the treatment of partnership items or partnership level determinations as to penalties, additions to tax, and additional amounts may be filed or prosecuted.

Once the taxpayer signs such a waiver and it is countersigned by the Commissioner, the taxpayer cannot file an Administrative Adjustment Request (AAR) on any partnership items for the related TEFRA entity. This includes partnership items not specifically addressed on the attached Schedule of Adjustments.

| Signature of Taxpayer | Date Signed | Phone Number |
|---|---|---|
| Signature of Taxpayer | Date Signed | Phone Number |
| By (Signature and Title) | Date Signed | Phone Number |

| FOR<br>INTERNAL<br>REVENUE<br>USE ONLY | Date accepted for Commissioner | Signature |
|---|---|---|
| | Office | Title |

## INSTRUCTIONS FOR SIGNING FORM 870-PT

1. Sign the agreement if you wish to agree to the partnership items *and partnership level determinations as to penalties, additions to tax, and additional amounts,* as shown on the attached Schedule of Adjustments. The execution and filing of this offer will expedite the adjustment of tax liability.

2. If a JOINT RETURN OF A HUSBAND AND WIFE was filed and both spouses intend to agree, both spouses should sign Form 870-PT. One spouse may sign as agent for the other if acting under a power of attorney, which, if not previously filed, must accompany this form. The IRS may accept the signature of only one spouse at its discretion. However, the agreement will only be binding on the signing spouse.

3. If the taxpayer is a corporation, the agreement should be signed with the corporate name followed by the signature and title of the officer authorized to sign Form 870-PT.

4. Your attorney or agent may sign for you if this action is specifically authorized by a power of attorney, which if not previously filed, must accompany this form.

5. If this offer is signed by a trust, the agreement must be signed with the trust name, followed by the signature and title of the person authorized to sign on behalf of the trust. If the trustee is signing this agreement on behalf of the trust and all beneficiaries, a Form 56 must be signed by the trustee. If an individual beneficiary is signing the agreement to bind themselves to the agreement, no Form 56 is needed.

6. If the partner is an LLC, the agreement should be signed by the manager of the LLC or other authority as authorized by State law. The signature line should show: [Name of LLC], by [Name of Manager], Followed by the title [Manager].

7. For a partner who is a subsidiary corporation in a consolidated group:

   - If the agreement is for a partnership year(s) ending on or before the last day of a consolidated return year beginning before June 28, 2002, the agreement should be signed by a currently authorized officer of the corporation who was the common parent corporation of the consolidated group for the relevant consolidated return year(s). The common parent corporation signs the agreement in its own name. The signature and title of a current officer of the common parent corporation, who is authorized to bind the common parent corporation, should be displayed in the signature block. See Treas. Reg. § 1.1502-77A(a).

   - If the agreement is for a partnership year(s) ending on or before the last day of a consolidated return year beginning on or after June 28, 2002, a currently authorized officer of the subsidiary corporation should sign the agreement and should do so in the name of the subsidiary corporation. See Treas. Reg. § 1.1502-77(a)(6)(iii). The signature and title of a current officer of the subsidiary corporation, who is authorized to bind the corporation, should be displayed in the signature block. The agreement should also be signed

by a currently authorized officer of the corporation who was the common parent corporation of the consolidated group for the relevant consolidated return year(s). The signature and title of a current officer of the common parent corporation, who is authorized to bind the common parent corporation, should also be displayed in the signature block.

8. For a partner who is the common parent corporation of a consolidated group, a currently authorized officer of the corporation who was the common parent corporation of the consolidated group for such consolidated return year(s) should sign the agreement in the name of the common parent corporation. See Treas. Reg. § 1.1502-77(a).

9. If the Tax Matters Partner signs this offer, please include the title with the signature.

10. If the Tax Matters Partner is a subsidiary corporation in a consolidated group:

    - If the agreement is for a partnership year(s) ending on or before the last day of a consolidated return year beginning before June 28, 2002, then a currently authorized officer of the corporation who was the common parent corporation of the consolidated group for such consolidated return year should sign the agreement on behalf of the Tax Matters Partner. The signature and title of a current officer of the common parent corporation, who is authorized to bind the common parent corporation, should be displayed in the signature block. See Treas. Reg. § 1.1502-77A(a). An authorized officer for the subsidiary corporation should also sign if it, as the Tax Matters Partner, is binding non-notice partners under the agreement. The signature and title of a current officer of the subsidiary corporation, who is authorized to bind the corporation, should be displayed in the signature block

    - If the agreement is for a partnership year(s) ending on or before the last day of a consolidated return year beginning on or after June 28, 2002, then a currently authorized officer of the subsidiary corporation should sign the agreement in the name of the subsidiary corporation. See Treas. Reg. § 1.1502-77(a)(3)(v). The agreement should also be signed by a currently authorized officer of the corporation who was the common parent corporation of the consolidated group for the relevant consolidated return year(s). The signature and title of a current officer of the common parent corporation, who is authorized to bind the common parent corporation, should also be displayed in the signature block.

**NOTE:** The submission of this offer by you and the acceptance of the offer for the Commissioner may result in an additional tax liability to you plus interest as provided by law. If the result is a decrease in tax, the amount of the decrease will be sent to you with interest as provided by law.

Department of the Treasury — Internal Revenue Service

## Agreement for Partnership Items and Partnership Level Determinations as to Penalties, Additions to Tax, and Additional Amounts

### SCHEDULE OF ADJUSTMENTS

| NAME OF PARTNERSHIP | TAX YEAR(S) ENDED | | |
|---|---|---|---|
| Belnord Realty Associates, L. P. | | | |
| EIN ▇▇▇▇▇▇ | 12/31/2006 | | |
| DETAIL OF ADJUSTMENTS TO ORDINARY INCOME | | | |
| | | | |
| TOTAL ADJUSTMENTS TO ORDINARY INCOME | | | |
| OTHER ADJUSTMENTS | | | |
| A. Charitable Contributions 30% | | | |
| (1) ADJUSTMENT | 90,425,553 | | |
| (2) AS REPORTED | 90,425,553 | | |
| (3) CORRECTED | 0.00 | | |
| B. Other Deductions | | | |
| (1) ADJUSTMENT | 0.00 | | |
| (2) AS REPORTED | 7,922,350 | | |
| (3) CORRECTED | 7,922,350 | | |

REMARKS

IRC section 6662(h), or in the alternative, IRC section 6662(a), penalty applies.  See Form 886-A, Explanation of Items.

## Form 870-PT, Other Adjustments (Continued)

Page _____ of _____

| NAME OF PARTNERSHIP | TAX YEAR(S) ENDED | | |
|---|---|---|---|
| Belnord Realty Associates, L. P. | | | |
| EIN ███████ | 12/31/2006 | | |
| C. Investment Income included in portfolio income | | | |
| (1) ADJUSTMENT | 0.00 | | |
| (2) AS REPORTED | 855,239 | | |
| (3) CORRECTED | 855,239 | | |
| D. Adj./tax pref. items depreciation in serv. after 1986 | | | |
| (1) ADJUSTMENT | 0.00 | | |
| (2) AS REPORTED | -88,957 | | |
| (3) CORRECTED | -88,957 | | |
| E. Distributions - money (cash/securities) | | | |
| (1) ADJUSTMENT | 100,000,000 | | |
| (2) AS REPORTED | 100,000,000 | | |
| (3) CORRECTED | | | |
| F. | | | |
| (1) ADJUSTMENT | | | |
| (2) AS REPORTED | | | |
| (3) CORRECTED | | | |
| G. | | | |
| (1) ADJUSTMENT | | | |
| (2) AS REPORTED | | | |
| (3) CORRECTED | | | |
| H. | | | |
| (1) ADJUSTMENT | | | |
| (2) AS REPORTED | | | |
| (3) CORRECTED | | | |
| I. | | | |
| (1) ADJUSTMENT | | | |
| (2) AS REPORTED | | | |
| (3) CORRECTED | | | |

| Form 886-A (Rev. January 1994) | EXPLANATION OF ITEMS | Schedule number or exhibit |
|---|---|---|
| Name of taxpayer<br><br>Belnord Realty Associates, L. P. | Tax Identification Number<br><br>██████ | Year/Period ended<br><br>December 31, 2006 |

A. Charitable Contributions (Non-cash 30% Limit)

It has not been established that all the requirements of Internal Revenue Code (IRC) section 170 and the corresponding Treasury Regulations, including, but not limited to Treas. Reg. sections 1.170A-13 and 1.170A-14, have been satisfied for the non-cash charitable contribution of a qualified conservation contribution. Accordingly, charitable contributions are reduced by $90,425,553 for the tax year ended December 31, 2006 (2006).

Alternatively, if it is determined that all the requirements of IRC section 170 have been satisfied for all, or any portion of the claimed non-cash charitable contribution, it has not been established that the value of the contributed property interest was $90,425,553 as claimed on the 2006 return. Accordingly, the deduction has been disallowed.

Accuracy-Related Penalty

Any underpayments of tax resulting from the adjustments and determinations above for the tax year ended December 31, 2006, are subject to the following accuracy-related penalties imposed by IRC section 6662:

A 40% penalty for gross valuation misstatement under IRC section 6662(a) and 6662(h), or in the alternative,

a 20% penalty due to negligence or intentional disregard of rules and regulations, substantial understatement of tax, or a substantial valuation misstatement under IRC section 6662(a) and 6662(b)(1), 6662(b)(2) or 6662(b)(3).

To the extent there are non-partnership items, including the application and computation of the penalty under IRC sections 6662(b)(2) and 6662(d), the final determination of the partners' liabilities for accuracy-related penalties will be made at partner-level proceedings.

**Exhibit B**

NATIONAL ARCHITECTURAL TRUST HISTORIC PRESERVATION EASEMENT - PAGE 1

## HISTORIC PRESERVATION DEED OF EASEMENT

This Historic Preservation Deed of Easement (the "Easement"), is made on the 4th day of December, 2006 by Extell Belnord LLC, with a mailing address at 800 Third Avenue, 4th Floor, New York, New York 10022 ("Grantor") to the National Architectural Trust, Inc., with offices at 1906 R Street, N.W., Washington, D.C. 20009 ("Grantee").

### RECITALS

A.      Grantee is a non-profit corporation chartered under the laws of the District of Columbia to promote a public aesthetic in land use planning, including the preservation of historically important properties.  Grantee hereby represents and warrants that it is a "qualified organization" as defined in Section 170(h)(3) of the Internal Revenue Code of 1986 (the "Code").

B.      Grantee is authorized to accept and administer gifts of real and personal property, including easements and restrictions for conservation and historic preservation purposes, in furtherance of its tax-exempt purposes. Grantee has the resources to manage and enforce this Easement and, by execution of this Easement, commits to its enforcement.

C.      Grantor is the owner, in fee simple, of real property commonly known as 225 West 86th Street, New York, New York, as legally described on Attachment A, attached hereto and incorporated herein by this reference and in a Bargain and Sale Deed dated October 19, 2006 and recorded on November 13, 2006 in the Office of the City Register of the City of New York as CRFN 2006000626785 (the "Property").

D.      The Property is improved with a structure (the "Building" and, together with the Property, the "Premises"), more fully described in the baseline documentation attached hereto and incorporated herein by this reference as Attachment B.

E.      The Property consists of a twelve-storied luxury apartment building designed in 1909 in the Neo-Renaissance style.  The Building occupies a full city block, with a north façade facing onto West 87th Street (343 feet in width), a south façade facing onto West 86th Street (348 feet and ten inches in width), an east façade facing onto Amsterdam Avenue (201 feet and five inches in width), and a west façade facing onto Broadway (201 feet and eleven inches in width).  The Building also features a large interior courtyard, of approximately 231 feet on its north and south façades, and of approximately 94 feet on its east and west façades.  Refer to Attachment B for a full description.

Total number of pages:  21
Commercial                                                        Revised September 2006

HF 3449541v.4 #10724/0003

F.      The Property was designated by the New York City Landmark's Preservation Commission as an individual landmark on September 20, 1966 and was listed on the National Register of Historic Places on April 23, 1980. The grant of the restriction as set forth in this instrument will assist in preserving a certified historic structure and its character-defining features as depicted in photographs and descriptions on Attachment B and defined herein below as "Protected Façades".

G.      Grantor, on behalf of itself and any successors or assigns, desires to grant in perpetuity to Grantee, and Grantee desires to accept from Grantor, the Easement on the Premises, exclusively for conservation and historic preservation purposes.

H.      The term "Protected Façades", as used herein, consists of all exterior surfaces of the Building, including, but not limited to, all exterior walls, windows and doors on the front, sides and rear of the Building, the height of the Building, including the roofs and chimneys, and landscape features noted as character-defining features on Attachment B, attached hereto and incorporated herein by this reference and any other character-defining features of the Premises. Written descriptions and photographs of the Protected Façades and their character-defining features are appended hereto as part of Attachment B. It is the intent of the parties that the Protected Façades remain essentially unchanged and, wherever visible from a public way, in full public view. Any change to the Protected Façades shall require prior express written approval by Grantee and shall be consistent with the historical character of the Protected Façades, as required under Section 170 of the Code and related Treasury Regulations, and be in compliance with any other applicable federal laws, including, but not limited to, *The Secretary of the Interior's Standards for the Treatment of Historic Properties with Guidelines for Preserving Rehabilitating, Restoring and Reconstructing Historic Buildings* (36 C.F.R. §§67 & 68), as amended from time to time (the "Secretary's Standards"), and any applicable state and local laws (hereinafter, collectively "Applicable Preservation Laws"). *In case of ambiguity regarding the condition of the Protected Façades at the time of* conveyance of the Easement, the photographs and descriptions constituting Attachment B shall control.

I.      Grantor intends to preserve the Protected Façades in their entirety, to prevent the destruction of the Building and to prevent the alteration of the size, profile and silhouette of the Building in any manner that would adversely affect the appearance or structural integrity of the Protected Façades.

J.      It is the purpose of this Easement to assure that the architectural, historical and cultural features of the Premises will be retained and maintained forever, substantially in their current condition for conservation and preservation purposes in the public interest, and to prevent any change to the Premises that will impair or interfere with the conservation and preservation values of the Premises or that will be detrimental to its preservation.

**NOW, THEREFORE,** in consideration of the mutual covenants and agreements set forth herein, including the terms, conditions and restrictions hereinafter set forth, and other good and valuable consideration, the receipt and sufficiency of which are hereby acknowledged, Grantor does hereby grant, give, bargain, transfer and convey to Grantee, its successors and assigns, irrevocably and forever, an easement, in gross, in perpetuity, in, on and to the Premises and the Protected Façades, being a Historic Preservation Deed of Easement on the Property, with the following rights and conditions:

1.  **Covenants of Grantor; Prohibited Activities.** Without the express written consent of Grantee, which consent shall only be given if in compliance with standards set forth in Applicable Preservation Laws, and which may be withheld, conditioned or delayed in the sole and absolute discretion of Grantee, Grantor shall not undertake nor suffer nor permit to be undertaken:

    a)    The demolition, razing, destruction or removal of the Building or any portion of the Protected Façades.

    b)    Any alteration, construction or remodeling of existing improvements on the Property, or the placement thereon or on the Building or Protected Façades of signs or markers that would alter or change the condition or appearance of the Protected Façades as they existed on the effective date of this Easement, and as documented in photographs and written descriptions included in the baseline documentation set forth on Attachment B; provided, however, that dignified signs or markers may be placed on the Protected Façades without consent of Grantee so long as they: (i) indicate no more than the street address and occupants of the premises; or (ii) are necessary to direct pedestrians or vehicular traffic; or (iii) commemorate the history of the Property or the grant of this Easement; or (iv) do not unduly obscure or cause damage to the character-defining features of the Protected Façades as described on Attachment B; or (v) are at the ground floor level identifying retail stores located in the Building's ground floor and meet New York City's commercial signage rules.

    c)    Any exterior extension of existing improvements on the Property or the erection of any new or additional improvements on the Property or in the open space above or surrounding the existing improvements.

    d)    The rebuilding of the Protected Façades if totally or substantially destroyed, (e.g., by fire). In considering the request for Grantee's approval, Grantee shall permit some variations in the reconstruction and replication of the Protected Façades, so long as the rebuilt Protected Façades will be consistent with the style, mass and height characteristics of the Historic District in which the Property is located, as determined in Grantee's sole discretion, and in compliance with any standards or requirements set forth in Applicable Preservation Laws, including, but not limited to the Secretary's Standards.

NATIONAL ARCHITECTURAL TRUST HISTORIC PRESERVATION EASEMENT - PAGE 4

e)    Any exterior extension of the existing improvements or erection of any new internal or external improvements on the Property affecting the store front(s), if any, located at the ground floor level of the Protected Façade(s).

f)    The painting or cleaning of the Protected Façades in a manner incompatible with the protection and preservation of the Protected Façades; provided, however, that the painting and cleaning in connection with regular maintenance of presently existing elements of the Protected Façades is permitted without Grantee's consent so long as it is conducted in a manner which will maintain the appearance of the Protected Façades as they exist at this date and so long as it is conducted in a manner which is in compliance with the standards set forth under Applicable Preservation Laws.

g)    The reconstruction, repair and refinishing of presently existing elements of the Protected Facades, damage to which has resulted from casualty loss, destruction or deterioration; provided, however, that Grantee's consent shall not be unreasonably withheld if such reconstruction, repair and refinishing will be conducted in a manner which will maintain the appearance of the Protected Façades as they exist at this date and so long as it will be conducted in a manner which is in compliance with the standards set forth under Applicable Preservation Laws.

h)    The erection, planting or growing of any hardscape or softscape features on the Property that could impair the visibility of the Protected Façades from the public street level, as such public access is required under Treasury Regulation Section 1.170A-14(d)(5)(iv) (the "Access Regulation"). In consideration of the Access Regulation, Grantor agrees that it shall make the interior courtyard of the Premises available for tours by the general public no less than twelve (12) days per year. All such tours shall be conducted under the supervision of Grantee with consideration for the privacy of the individuals residing at the Premises. In addition, Grantor agrees that it shall permit persons affiliated with educational organizations, professional architectural associations and historical societies to make individual appointments with Grantee to study the Premises; it being understood that such appointments shall occur at reasonable times and upon reasonable advance notice to Grantor. Grantee shall also be permitted to photograph the Premises (including the interior courtyard) and to distribute such *photographs to magazines, newsletters and other publications available to the public.*

i)    To the extent that Grantor owns or is entitled to development rights which may exist now or at some time hereafter by reason of the fact that under any applicable zoning or similar ordinance the Premises may be developed to a use more intensive (in terms of height, bulk or other objective criteria regulated by such ordinances) than the Premises are devoted as of the date hereof, the exercise or transfer of such development rights on, above or below the Premises in a manner that would interfere with the preservation and conservation purposes of this Easement.

Commercial                                                            Revised September 2006

Grantor and Grantee agree to abide by the Change Approval Guidelines attached hereto and incorporated herein as Attachment C.

**2.    Standards of Work.**  Grantor agrees that any repair, replacement, alteration or rehabilitation or new construction work on the Protected Façades, whether or not Grantee has given consent to undertake the same, shall comply with the requirements of Applicable Preservation Laws and all other applicable federal, state and local governmental laws and regulations. Without limiting the foregoing, in undertaking maintenance, repair, replacement or reconstruction, Grantor shall apply the Secretary's Standards.

**3.    Maintenance.**  Grantor agrees to maintain in good order the Protected Façades, the foundations and the overall structural integrity of the Building in the condition and appearance existing on the effective date of this Easement as documented in photographs and written descriptions included in the baseline documentation set forth on Attachment B. In the case of a building where the government requires periodic engineering reports on the soundness of some or all elements of the building, Grantor promises to promptly: (a) prepare and file or cause the preparation and filing of such reports with the requisite governmental authority, and (b) provide copies of such reports to Grantee.

**4.    Grantor's Representations and Warranties.**  Grantor represents and warrants that:

a)    Grantor is the owner in fee simple of the Premises;

b)    Grantor is fully authorized and empowered to execute and deliver this Easement;

c)    There is no lien, encumbrance, contract or governmental prohibition against the execution and delivery of this Easement and the performance by Grantor of all of Grantor's obligations hereunder; and

d)    Grantor acknowledges and understands that: (i) all mortgage and lien holders must subordinate or partially release their interests in the Premises to the conservation purposes of this Easement for the donation of the Easement to qualify as a tax-deductible contribution, and (ii) if, for any reason, this Easement is not in the first position, the tax deductibility of the easement donation may be at risk.

**5.    Arbitration.**  If a dispute arises between Grantor and Grantee concerning the consistency of any proposed activity with the purpose or restrictions of this Easement, and Grantor agrees not to proceed with the activity pending resolution of the dispute, either party may refer the dispute to arbitration by request made in writing to the other. Arbitration shall be conducted in the locality where the Property is located in accordance with the rules and regulations of the Expedited Procedures of the American Arbitration Association, before three (3) arbitrators, one (1) chosen by each of Grantor, Grantee and the above chosen arbitrators,

provided that such arbitrators shall have not less than ten (10) years of experience in the field of restoration, rehabilitation and preservation of landmark and historic buildings and sites. Judgment by such arbitrators shall be fixed and binding upon all parties and may be entered in any court having jurisdiction thereover. Each party shall be responsible for its own legal fees and expenses, for the costs and expenses of the arbitrator designated by it, and for one-half (1/2) of the costs and expenses of the third arbitrator. Each party shall appoint its arbitrator within ten (10) business days of service of the arbitration notice, and in the event any of the parties shall fail to do so, the arbitrator chosen by the other party alone shall be entitled to issue a decision binding both of the parties hereto, and in such case each of the parties hereto shall be responsible for one-half (1/2) of such single arbitrator's legal fees and expenses. The arbitrator(s) shall issue their decision within twenty-one (21) days of submission.

6.    **Remedies.**  Grantee, in order to ensure the effective enforcement of this Easement, shall have, and Grantor hereby grants it, the following rights and remedies:

   a)    At reasonable times and upon reasonable notice, the right to enter upon and inspect the Protected Façades and any improvements thereon. Grantor acknowledges that in order for Grantee to obtain proper access to inspect the Protected Façades, Grantee may require access through the interior of the Building.

   b)    In the event of a violation of this Easement and Grantor's failure to cure, or to propose an acceptable cure agreement to Grantee, within fifty (50) business days (subject to force majeure) of the date of a Violation Notice ("Violation Notice" shall mean written notification to Grantor of a violation of this Easement setting forth the commencement of the fifty-day period to cure or propose an acceptable agreement to cure to Grantee):

      (i)    the right to institute legal proceedings to enjoin such violation by temporary, and/or permanent injunction, including prohibitory or mandatory injunctive relief, to require the restoration of the Property or the Building, including the Protected Façades and open space appurtenant thereto, to their prior condition, in addition to such other relief to which Grantee may be entitled, including specific performance of the terms of this Easement, without the necessity of proving either actual damages or the inadequacy of otherwise available legal remedies, to be reimbursed by Grantor for all reasonable costs and attorneys' fees, and to avail itself of all other legal and equitable remedies;

      (ii)    the right to: (x) enter upon the Premises and improvements thereon in order to correct such violation, (y) hold Grantor responsible for the cost thereof, and (z) obtain a judgment against Grantor with respect to the cost of all labor performed and materials furnished to complete such improvements; and

      (iii)    the right to place a lien against the Property to secure the payment of any of Grantor's obligations arising under this Easement. Notwithstanding any provision of this Easement to the contrary, any lien securing Grantee and created pursuant to Grantor's obligations hereunder shall be subordinate to the lien on the Premises of UBS Real Estate

NATIONAL ARCHITECTURAL TRUST HISTORIC PRESERVATION EASEMENT    PAGE 7

Securities Inc., as set forth in that certain Mortgage, Assignment of Leases and Rents and Security Agreement and Consolidation, Modification and Restatement Agreement dated as of October 19, 2006 and recorded on November 13, 2006 in the Office of the City Register of the City of New York as CRFN 2006000626786, its successors and assigns and any other bank, savings and loan, commercial finance company or other lending institution that has made a loan to any owner of the Premises, whether such lien be now existing or hereafter created (each, a "Mortgage Lien Lender" and, collectively, "Mortgage Lien Lenders"). The sale or transfer of the Premises pursuant to a foreclosure or any proceeding in lieu thereof shall extinguish Grantee's lien, subject to Grantee's rights to receive any excess proceeds in accordance with Grantee's order of priority. Furthermore, any indebtedness represented by Grantee's lien shall continue as a personal obligation of Grantor, Grantor's successors, heirs and assigns, and all other successors in interest to Grantor.

Grantee agrees to provide to the Mortgage Lien Lender(s) then reflected in Grantee's records copies of all Violation Notices (as defined above) delivered by Grantee to Grantor within five (5) days of delivery of such Violation Notice to Grantor.

c)    In the event of a threatened violation of this Easement, the right to institute legal proceedings to enjoin such violation by temporary, and/or permanent injunction.

d)    Exercise by Grantee of one remedy hereunder shall not have the effect of waiving or limiting any other remedy, and the failure to exercise any remedy shall not have the effect of waiving or limiting the use of any other remedy or the use of such remedy at any other time.

Grantee has no liability or responsibility of any kind related to the Premises, including the ownership, operation, insurance or maintenance of the Premises.

7.    **Insurance**. Grantor, at its own expense, shall keep the Premises insured by an insurance company against loss from the perils commonly insured under the so called "All Risk" or "Special Form" property policies and commercial general liability insurance policies in use from time to time, including fire, lightning, wind storm, hail, explosion damage by vehicles, smoke, vandalism, malicious mischief, weight of ice, snow or sleet, freezing of plumbing, HVAC or sprinkler systems, and sudden and accidental damage from artificial electrical current explosion, in such amounts as would normally be carried on a structure such as the Building. Such insurance shall include Grantee's interest, shall name Grantee as an additional insured and shall provide for at least thirty (30) days' notice to Grantee before cancellation. In the event that Grantor fails to obtain insurance, Grantee shall have the right, but not the obligation, to provide the same at Grantee's cost and expense, in which event the cost of such insurance shall constitute a lien on the Premises until repaid by Grantor. Whenever the Premises is encumbered with a mortgage or deed of trust, nothing contained in this paragraph shall jeopardize the prior claim, if any, of the mortgagee/lender to the insurance proceeds to the extent provided in paragraph (a) of Attachment D.

8.    **Indemnification**.  Grantor shall pay, protect, defend, indemnify and hold harmless Grantee and its directors, officers, trustees, employees, agents and contractors, and the successors and assigns of each of them (collectively, the "Indemnified Parties"), from and against any and all claims, judgments, liabilities, penalties, costs, damages and expenses (including, without limitation, reasonable attorneys' fees arising out of or in connection with the Building or the Property (a "Claim" or "Claims"), including, without limitation: (a) injury to or death of any person, (b) physical damage to the Property, (c) the presence of or release onto the Property of any hazardous, toxic, polluting or contaminating substance, (d) any other injury or damage occurring on or about the Building or the Property, (e) any real property taxes and general or special assessments assessed against the Building or the Property, or (f) this Easement, the conveyance or possession hereof or the exercise of any rights hereunder; provided, however, that Grantor shall not indemnify any of the Indemnified Parties to the extent that any Claim or Claims are based upon the gross negligence or willful misconduct of such Indemnified Party.

9.    **Proposed Sale**.  Grantor shall promptly notify Grantee in writing of any proposed sale of the Premises.  Grantor agrees to incorporate the terms of this Easement by reference in any deed or other legal instrument by which Grantor divests themselves of any interest in all or a portion of the Premises, including without limitation, a leasehold interest.  The failure of Grantor to perform any act required by this paragraph shall not impair the validity of this Easement or limit its enforcement in any way; provided however, if Grantor fails to provide notice of this Easement to any future purchaser or lien holder prior to the date this Easement is recorded, Grantor acknowledges that this Easement may be found invalid or unenforceable in perpetuity and Grantor's deduction in relation to this Easement donation may be disallowed.

10.    **Liens**.

        a)    Any lien on the Premises created pursuant to this Easement may be confirmed by judgment and foreclosed by Grantee in the same manner as a judgment lien, except that no lien created pursuant to this Easement shall jeopardize the priority of any recorded lien of mortgage or deed of trust given in connection with a promissory note secured by the Premises.

        b)    Any lien on the Premises created pursuant to this Easement shall be subordinate to the Easement itself.

11.    At the time of conveyance of the Easement, the Premises are subject to a mortgage, the holder of which has agreed by separate instrument, a copy of which is attached hereto as Attachment D and incorporated by this reference, to subordinate or partially subordinate its rights in the Premises to the extent necessary to permit Grantee to enforce the purposes of this Easement in perpetuity and to prevent any modification or extinguishment of this Easement by the exercise of any rights of the mortgage holder.

92.

NATIONAL ARCHITECTURAL TRUST HISTORIC PRESERVATION EASEMENT – PAGE 9

**12.   Binding Effect; Assignment.**

a)      This Easement is binding not only upon Grantor but also upon its successors, heirs and assigns and all other successors in interest to Grantor, and the word "Grantor", when used herein, shall include all such persons. This Easement shall: (i) be effective in perpetuity, (ii) be deemed to run as a binding servitude with the Property, and (iii) survive any termination of Grantor's existence. A person shall have no obligation pursuant to this Easement after such person ceases to have any interest in the Premises and Protected Façades by reason of a bona fide transfer for full value and shall not have any liability arising from acts or omissions committed subsequent to such transfer; provided, however, that such a transfer shall not relieve any person from liability arising from acts or omissions committed prior to such transfer, for which such person shall remain liable.

b)      This Easement shall survive any termination of Grantee's existence.  This Easement is fully transferable by Grantee; provided, however, that Grantee shall not transfer, assign or otherwise convey its rights under this Easement: (i) except to another "qualified organization" described in Section 170(h)(3) of the Code and controlling Treasury regulations, and (ii) unless the transferee: (x) is an organization whose purposes, inter alia, are to promote the preservation or conservation of historic, cultural or architectural resources, and (y) agrees to continue to carry out the conservation purposes for which the Easement was created; provided further that nothing herein contained shall be construed to limit Grantee's right to give its consent (e.g., to changes to a Protected Façade).  The rights of Grantee under this Easement shall run for the benefit of and may be exercised by its successors and assigns, or by its designees duly authorized in a deed of easement.

**13.   Effective Date.**  This Easement shall be effective as of the date this Easement is submitted for recording with the appropriate land records register's office.

**14.   Conversion Proceeds.**  As required pursuant to Treasury Regulation 1.170A-14(g)(6), Grantor hereby agrees and acknowledges that the donation of this Easement gives rise to a property right, immediately vested in Grantee, with a fair market value that is at least equal to the proportionate value that the perpetual conservation restriction at the time of the gift, bears to the value of the property as a whole at that time as set forth by Grantor's appraisal.  In the event of an unexpected change in the conditions surrounding the Property making impossible or impractical the continued use of the Property for conservation purposes, Grantor and Grantee may petition for judicial extinguishment of this Easement pursuant to the requirements set forth in New York State Consolidated Laws and in compliance with the requirements set forth in Treasury Regulation 1.170A-14(g)(6). Grantee agrees to use any proceeds so realized in a manner consistent with the conservation purposes of the original contribution.

**15.   Photographs.**  Grantee may make photographs, drawings or other representations documenting the significant historical, cultural and architectural character and features of the

Building and may use them to fulfill its charitable and educational purposes, including but not limited to distributing them to magazines, newsletters or other publicly available publications.

16.    **Entire Agreement.** This Easement reflects the entire agreement between Grantor and Grantee. Any prior or simultaneous correspondence, understandings, agreements, and representations are null and void upon execution hereof, unless set out in this instrument.

**TO HAVE AND TO HOLD**, the said Historic Preservation Deed of Easement, unto the said Grantee and its successors and permitted assigns forever. This HISTORIC PRESERVATION DEED OF EASEMENT may be executed in two counterparts and by each party on a separate counterpart, each of which when so executed and delivered shall be an original, but both of which together shall constitute one instrument.

**<THE REMAINDER OF THIS PAGE IS INTENTIONALLY LEFT BLANK>**

**94.**

NATIONAL ARCHITECTURAL TRUST HISTORIC PRESERVATION EASEMENT – PAGE 11

**IN WITNESS WHEREOF**, the Parties hereto have caused duplicate originals of this Historic Preservation Deed of Easement to be executed by their respective duly authorized representatives as of the date and year written below.

I declare under penalty of perjury that I am authorized to execute this Historic Preservation Deed of Easement on behalf of Grantor; I have examined the contents of this Easement; and I believe that all representations are true and correct to the best of my knowledge, information and belief.

**GRANTOR**

**EXTELL BELNORD LLC,**
**a Delaware limited liability company**

By: _____

    Name:  Gary Barnett

    Title:    President

Date:  December 6, 2006

---

**Grantor Notarization**

| **(Taken within the State of New York)** | **(Taken outside the State of New York)** |
|---|---|
| State of New York    )<br>                ) ss.:<br>County of New York  ) | State of            )<br>                ) ss.:<br>County of        ) |
| On the 6th day of December, 2006, before me, the undersigned, a Notary Public in and for the State of New York, personally appeared Gary Barnett personally known to me or proved to me on the basis of satisfactory evidence to be the individual(s) whose name(s) is (are) subscribed to the within instrument and acknowledged to me that he/she/they executed the same in his/her/their capacity(ies), and that by his/her/their signature(s) on the instrument, the individual(s), or the person upon behalf of which the individual(s) acted, executed the instrument. | On the _____ day of December, 2006, before me, the undersigned, personally appeared_____<br>_____ personally known to me or proved to me on the basis of satisfactory evidence to be the individual(s) whose name(s) is (are) subscribed to the within instrument and acknowledged to me that he/she/they executed the same in his/her/their capacity(ies), and that by his/her/their signature(s) on the instrument, the individual(s), or the person upon behalf of which the individual(s) acted, executed the instrument and that such individual made such appearance before the undersigned in _____ *[city, state or county or other place acknowledgment taken].* |
| _____<br>Notary Public<br>My commission expires: _____ | _____<br>Notary Public<br>My commission expires: _____ |

Henri Schachter
Notary Public, State of New York
No. 01 01102253
Qualified in _____ ty
Commission Expires _____ 2009

Commercial                                                 Revised September 2006

NATIONAL ARCHITECTURAL TRUST HISTORIC PRESERVATION EASEMENT – PAGE 12

I declare under penalty of perjury that I am authorized to execute this Historic Preservation Deed of Easement on behalf of Grantee; I have examined the contents of this Easement; and I believe that all representations are true and correct to the best of my knowledge, information and belief.

**GRANTEE**

**National Architectural Trust, Inc.**                    (CORPORATE SEAL)

By: _Victoria C M'Cormick_
    Name: _Victoria C M°Cormick_
    Title: _Vice President_

Date: _12/07/06_

**Grantee Notarization**

District of Columbia   ) ss.

On this 7th day of December, 2006, before me, the undersigned notary public, personally appeared _Victoria C. McCormick_, proved to me through satisfactory evidence of identification which was [a current driver's license] [a current U.S. passport] [my personal knowledge of the identity of the principal], to be the person whose name is signed on the preceding or attached document, and acknowledged to me that he/she signed it voluntarily for its stated purposes.

_Mary Quirk_
Notary Public

_Mary Quirk_                                   My Commission Expires: _4/14/2011_
Print Name

Mary Quirk
Notary Public, District of Columbia
My Commission Expires 4/14/2011

Commercial                                                      Revised September 2006

NATIONAL ARCHITECTURAL TRUST HISTORIC PRESERVATION EASEMENT – PAGE 13

## Attachment A

### Legal Description of Property (from Deed)

ALL that certain plot, piece or parcel of land, situate, lying and being in the Borough of Manhattan, County, City and State of New York, bounded and described as follows:

BEGINNING at the corner formed by the intersection of the northerly side of 86th Street and the easterly side of Broadway;

THENCE northerly along the easterly side of Broadway, 201 feet 11 inches to the corner formed by the intersection of the easterly side of Broadway and the southerly side of 87th Street;

THENCE easterly along the southerly side of 87th Street, 328 feet 10 inches to the corner formed by the intersection of the southerly side of 87th Street with the westerly side of Amsterdam Avenue;

THENCE southerly along the westerly side of Amsterdam Avenue, 201 feet 5 inches to the corner formed by the intersection of the westerly side of Amsterdam Avenue and the northerly side of 86th Street;

THENCE westerly along the northerly side of 86th Street, 343 feet to the first mentioned corner, the point or place of BEGINNING.

NATIONAL ARCHITECTURAL TRUST HISTORIC PRESERVATION EASEMENT - PAGE 14

**Attachment B**

**Detailed Description and Photographs of Protected Façades**

No. 225 West 86th Street is a twelve-storied luxury apartment building designed in 1909 in the Neo-Renaissance style. The building occupies a full city block, with a north façade facing onto West 87th Street (343 feet in width), a south façade facing onto West 86th Street (348 feet and ten inches in width), an east façade facing onto Amsterdam Avenue (201 feet and five inches in width), and a west façade facing onto Broadway (201 feet and eleven inches in width). This building also features a large interior courtyard, of approximately 231 feet on its north and south façades, and of approximately 94 feet on its east and west façades.

The exterior façades are horizontally divided into four sections. The first section is comprised of the basement plus the first two floors (the basement is not visible at the north and east facades), is faced with heavily striated limestone, and is crowned with a limestone cornice. The second section is comprised of the third and fourth floors, is faced with lightly striated limestone, and is crowned with a large limestone cornice. The third section is comprised of the fifth through the eleventh floors, is faced with barely striated limestone, is quoined at the outer bays, and is crowned with a thin cornice. The fourth, and final, section is comprised of only the twelfth floor, which is faced with smooth limestone, into which are incised plain square panels between each window. Above this top floor is a large, bracketed, copper cornice.

The window bays of the façades of the ground floor (be it the basement or the first floor) are commercial store windows; they are interspersed with entrances into the building and courtyard. The south façade features two wide, tunneled archways framed with voussoirs through which vehicles may pass from West 86th Street to the interior courtyard; lining the tunnels are thrice-arched arcades, the central arches featuring revolving doors leading into the building. The ceilings of the tunnels are lined with elaborate mosaics. To the left of the arches are three small windows, followed by five large windows with awnings, followed by a large doorway with an elaborate, classically molded surround. To the right of the arches are three small windows, followed by a doorway, followed by three taller windows, followed by a large doorway with an elaborate, classically molded surround. The west façade features three such doorways with elaborate, classically molded surrounds, one at either corner, and one at the middle; all of these doors are glazed, with black-painted trim and mullions. To the left and right of the central doorway on the west façade are three large store windows with large panes of glass and transom windows. The north and east facades feature large store windows interspersed with simple entrances. The east façade features, from left to right: a large window, two doors, five large windows, and two door-and-window-bay combinations. The north façade features, from left to right: two large windows, two entrances, a window of regular size, three small windows, and several more entrances.

NATIONAL ARCHITECTURAL TRUST HISTORIC PRESERVATION EASEMENT – PAGE 15

The bays of the remaining floors are equally spaced. At these floors, the north façade is of twenty-two bays' width, the south façade is of twenty-four bays' width, and the east and west facades are both of sixteen bays' width. The windows at the edges of the facades are wider than the windows between them, and all of the windows are of two-over-two sash. The windows of the second floor of the north and east facades and the windows of the first and second floors of the south and west facades feature heavy sills; those of the fourth floor feature heavy sills with brackets. The windows of the fifth through the eleventh floors are slightly round-headed and feature small, carved keystones; those of the twelfth floor are shortened, suggesting an attic-like look. Oval wreathes supported by brackets, and carved of limestone, are affixed to the facades at the fourth floor, one to either side of each end window; long garlands flank each end window at the eleventh floor.

The interior courtyard is faced with striated, buff-colored bricks, and there is a continuous sill running around it at each floor level. A wide molding separates the basement and first floors from the second through the twelfth floors. The arches of the south façade (which lead out onto West 86th Street) are framed with voussoirs. Across from the arches, at the north façade, is an entrance with a black, hip-roofed awning. Originally, there were two pairs of glazed French doors with classically molded surrounds under this awning; today, the left-hand doors are replaced with limestone blocks, although their molding remains. The corners of the courtyard are beveled by one bay's width, and there is an entrance of glazed French doors with a classically molded surround and a black, hip-roofed awning at each beveled corner.

The east and west facades of the interior courtyard are each of ten window bays' width; two copper-sheathed, thrice-faceted oriels rise up over the central four bays of the east and west façades from the second floor to the roof. The north and south facades of the interior courtyard are each of twenty-three bays' width; the sixth bay in from each corner features one copper-sheathed, thrice faceted oriel rising up from the second floor to the roof. All of these oriels feature copper panels between the floors, one panel per facet, and each one ornamented with a decorative wreath. The central bay of the north and south facades features windows that do not rest on their floors' continuous sills, but whose heads instead abut the sills of the floors above them; they light interior staircases; the central eleven bays of these facades project slightly from the remaining bays. All of the windows but the ones whose heads abut the sills of the floors above them are of one-over-one sash; the remaining windows are of two-over-two sash. At the center of the courtyard there is a large stone fountain; it is square in shape, with beveled corners. To the east and west of the fountain are square parks.

The roof features a dark gray-painted penthouse with variably-sized windows. Hip-roofed skylights penetrate the roof over the building's southern length, while a tall water tank rises up over the building's northern length.

[PICTURES OF THE PROPERTY FOLLOW]

NATIONAL ARCHITECTURAL TRUST HISTORIC PRESERVATION EASEMENT – PAGE 16



East and North Facades



West and South Facades



Entrance Tunnel at South Facade



South, West, and North Façades of Interior Courtyard



South Façade of Interior Courtyard

Commercial

Revised September 2006

NATIONAL ARCHITECTURAL TRUST HISTORIC PRESERVATION EASEMENT – PAGE 17



Interior Courtyard Corner Entrance Façade



Interior Courtyard Entrance at North



Interior Courtyard Fountain



Roof

Commercial

Revised September 2006

**Attachment C**

**Change Approval Guidelines**

1.     Grantor must obtain advance written approval from Grantee to perform any work on the Premises as set forth in Section 1 of the Easement.  Change requests submitted to Grantee should generally include the Proposed Modification Request Form, drawings or photographs showing existing conditions, drawings showing proposed conditions and historical documentation, when required by Grantee.  Grantee reserves the right to request Grantor submit additional information and documentation regarding proposed work.

2.     In many cases, Grantor must also receive approval from local historic preservation authorities prior to making exterior alterations to the property.  In order to avoid any delay, Grantee recommends Grantor simultaneously send to Grantee a copy of the submission Grantor submits to the local historic preservation authority.

3.     Grantor's mailing address, unless otherwise notified, is:

> National Architectural Trust, Inc.
> 1906 R Street, NW, Suite 100
> Washington, D.C.20009
> Attention:  Director of Stewardship

4.     Grantee's review committee will review Grantor's request promptly.  Unless the proposed alterations are, in Grantee's opinion, quite complex, Grantee will respond to Grantor's change request within thirty (30) days.  Grantee's response will provide that either: (a) Grantee does not object to Grantor's plans and Grantor may proceed as planned,  (b) Grantor's plans require revision, along with a detailed explanation why such revisions are necessary, or (c) Grantee does not consent to Grantor's plans and Grantor may not proceed.

5.     Grantee monitors the condition and appearance of the exterior of the Protected Facades on an annual basis by taking exterior photographs of the Property and comparing the photographs to its baseline documentation as reflected on Attachment B to the Easement.  If Grantee identifies changes in the appearance of the Protected Facades that have not been approved by Grantee or deferred maintenance that threatens the character-defining features of the Protected Facades and/or the structural stability of the Building, Grantee will contact Grantor to initiate the process to redress any inappropriate changes or absence of maintenance of the Property.

**102.**

## Attachment D

## LENDER AGREEMENT

<u>Property at</u>:  225 West 86th Street, New York, New York

UBS Real Estate Securities Inc. ("Mortgage Lien Lender") hereby joins in the execution of this HISTORIC PRESERVATION DEED OF EASEMENT for the sole and limited purpose of subordinating its rights in the Property to the right of Grantee, its successors or assigns, to enforce the conservation purposes of this Easement in perpetuity under the following conditions and stipulations:

    (a) Except in the case of a change in conditions that gives rise to the extinguishment of this Easement, Mortgage Lien Lender shall have a prior claim to all insurance proceeds as a result of any casualty, hazard or accident occurring to or about the Property and all proceeds of condemnation, and shall be entitled to same in preference to Grantee, notwithstanding that any mortgage or deed of trust securing such Mortgage Lien is subordinate in priority to the Easement.

    (b) No Mortgage Lien Lender or purchaser in foreclosure shall have any obligation, debt, or liability under the Easement until after the Mortgage Lien Lender or a purchaser in foreclosure obtains ownership of the Property.  In the event of foreclosure or deed in lieu of foreclosure, the Easement is not extinguished.

    (c) Nothing contained in this paragraph or in this Easement shall be construed to give any Mortgage Lien Lender the right to violate the terms of this Easement or to extinguish this Easement by taking title to the Property by foreclosure or otherwise.

UBS Real Estate Securities Inc.,
a Delaware corporation

By: _____

Name: _____
        Jeffrey N. Lavine
        Managing Director

Title: _____

Date: _____12 / 4 / 06_____

UBS Real Estate Securities Inc.,
a Delaware corporation

By: _____

Name: _____
        Sarah Cantrowitz
        Director

Title: _____

Date: _____12 / 4 / 06_____

Commercial

Revised September 2006

**103.**

ACKNOWLEDGMENTS

STATE OF NEW YORK        )
                                          ss:
COUNTY OF NEW YORK    )

On the 4 day of December, in the year 2006 before me, the undersigned, personally appeared Jeffrey N. Lavine and Sarah Cantrowitz , personally known to me on the basis of satisfactory evidence to be the individual(s) whose name(s) is/are subscribed to the within instrument and acknowledged to me that he/she/they executed the same in his/her/their capacity(ies), and that by his/her/their signature(s) on the instrument, the individual(s), or the person upon behalf of which the individual(s) acted, executed the instrument.



REBECCA FORSYTHE
NOTARY PUBLIC, State of New York
No. 01FO6141618
Qualified in Queens County
Commission Expires February 27, 2010



**104.**

Historic Preservation Deed of Easement

**Title No.**                          **Section**  4
                                       **Block**   1234
EXTELL BELNORD LLC                      **Lot**     19
                                       **County or Town**   New York
**To:**                                **Street Address**   225 West 86th Street

NATIONAL ARCHITECTURAL
TRUST, INC.

**Once Recorded, Return By Mail To:**

National Architectural Trust, Inc.
1906 R Street, NW
Washington, D.C. 20009
Attn:  Jackie Scheer

**Reserve This Space For Use Of Recording Office**